Scott **BOSLEY**, Plaintiff,

v.

**HOME BOX OFFICE, INC.**, Defendant.

No. Civ.A. 98–2343–GTV.

United States District Court, D. Kansas.

July 14, 1999.

Mark K. Birmingham, Kansas City, KS, for Scott Bosley, plaintiff.

Bernard J. Rhodes, Lathrop & Gage L.C., Kansas City, MO, for Home Box Office Inc, defendant.

## *MEMORANDUM AND ORDER*

VANBEBBER, Chief Judge.

Plaintiff Scott Bosley brings this defamation case alleging that defendant Home Box Office ("HBO")[1] defamed him by repeatedly broadcasting documentary footage of anti-drug protestors stating that drugs were being sold from plaintiff's combination gas station/liquor store in Kansas City, Kansas. The case is before the court on defendant's motion for summary judgment (Doc. 29). For the reasons stated in this memorandum and order, defendant's motion is granted.

### *I. FACTUAL BACKGROUND*

The following facts are either uncontroverted or are based on evidence submitted with summary judgment papers viewed in a light most favorable to the nonmoving party. Immaterial facts and facts not properly supported by the record are omitted.[2]

In 1994, The Robert Wood Johnson Foundation commissioned an hour-long documentary on substance abuse for broadcast on the HBO national cable television network. The documentary, originally titled "Fighting Back," was to focus on efforts of local citizens to take back their neighborhoods from illegal drug use and associated crime. HBO contracted production of the documentary to independent documentary filmmaker Simon & Goodman Picture Company ("Simon & Goodman"). Simon & Goodman began researching possible locations for the film in

---

1. Plaintiff incorrectly sued Home Box Office, a division of Time Warner Entertainment Company, L.P., as Home Box Office, Inc.

2. Local Rule 56.1 requires plaintiff to controvert defendant's statement of facts with specific references to the evidentiary record.

Any statements of fact relying on evidence not adequately referenced in the record or not submitted with the summary judgment pleadings have been disregarded. *See Amro v. Boeing Co.,* 153 F.3d 726, 1998 WL 380510, at *1 n. 1 (10th Cir.1998).

December 1994. In late 1995, Kansas City, Missouri, was chosen as the location for the documentary.

In September 1995, Kirk Simon, co-president of Simon & Goodman, met with Ricardo Lucas of Kansas City's Project Neighbor–H.O.O.D., an organization involved in fighting Kansas City's drug problem at the community level. Lucas took Simon to a mock cemetery at the corner of 27th and Prospect Avenue in Kansas City, Missouri. The cemetery contained crosses depicting the names of local individuals who had suffered drug-related deaths. On New Years Eve 1995, Simon & Goodman began filming the documentary at a candlelight vigil at the corner of 27th and Prospect.

During the first night of filming, Simon met Dana and Alonzo Washington, two active members of Kansas City's anti-drug community. The Simon & Goodman production crew subsequently filmed the Washingtons during several of their anti-drug efforts. In the Summer of 1996, the Washingtons informed Simon that the couple would be attending a "Drug Free Hour" community protest at the intersection of 10th Street and Walker in Kansas City, Kansas. Simon was interested in the protest because he thought that footage of the protest would highlight the Kansas City community's fight against drugs.

At Alonzo Washington's suggestion, Simon contacted Beatrice Lee, an individual who lived near the intersection of 10th and Walker, to learn more about the upcoming protest. Lee informed Simon that she had helped plan the protest because drugs were being sold at the gas station/liquor store on the corner of 10th Street and Walker. She also showed Simon various police reports documenting criminal activity in the area.

On August 14, 1996, Simon and his crew filmed the protest. During the protest, many of the anti-drug protestors stated that they believed that drugs were being sold at the gas station/liquor store, and urged citizens not to patronize the store.

The gas station/liquor store had been the subject of controversy prior to the August 14, 1996 protest. At a Kansas City, Kansas, city council meeting held on July 18, 1996, numerous individuals provided testimony to the fact that drugs were being sold not only in the parking lot of the gas station/liquor store, but also by employees of the gas station/liquor store from behind the counter. Furthermore, the Kansas City, Kansas, police department had received complaints alleging that illegal activity, including the sale of drugs, was occurring at the gas station/liquor store.

The owner of the gas station/liquor store was plaintiff Scott Bosley. Bosley denies that drugs were sold from his place of business. In response to the protest and other community efforts to close his gas station/liquor store, Bosley fought back in the local media. On the day of the protest, Bosley gave an interview to a local television reporter during which he stated that the neighbors' allegations were "bull___" and that drugs were not being sold from his business. In addition, on August 29, 1996, the *Kansas City Kansan* newspaper published a front-page article featuring a photograph of Bosley and articulating Bosley's side of the controversy.

HBO's documentary, titled "27th and Prospect: One Year in the Fight Against Drugs," was completed in the Summer of 1997 and aired for the first time on August 6, 1997—approximately one year after the protest at 10th and Walker. The documentary relates the efforts of numerous community groups to combat drug-related crime in the Greater Kansas City area and chronicles the destructive toll drugs take on families and neighborhoods. Included within the documentary is two minutes and thirteen seconds of non-narrated footage of the August 14, 1996 protest in front of plaintiff's store. The relevant footage shows protestors holding signs urging citizens not to patronize the store at 10th and Walker because drugs were being sold there. While the documentary shows the store and its gas pumps from various an-

gles, it does not identify Bosley as the store's owner nor does it give the address of the store.

## II. SUMMARY JUDGMENT STANDARDS

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupportable claims or defenses, and Rule 56 should be interpreted in a way that accomplishes this purpose. See Celotex Corp. v. Catrett, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court's proper inquiry is whether there is a need for a trial; in other words, whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by "showing" that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256, 106 S.Ct. 2505. Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. See id.

## III. DISCUSSION

Plaintiff claims that defendant defamed him by repeatedly broadcasting footage of anti-drug protestors stating that drugs were being sold from plaintiff's store in Kansas City, Kansas. In Kansas, the elements of defamation include (1) false and defamatory words (2) communicated to a third person (3) which result in harm to the reputation of the person defamed. See Luttrell v. United Tel. Sys., Inc., 9 Kan.App.2d 620, 620–21, 683 P.2d 1292 (1984). Defendant has two main arguments in support of the instant motion for summary judgment. First, defendant claims that plaintiff has suffered no harm to his reputation; therefore, he has failed to establish a valid defamation claim. Second, defendant claims that even if a prima facie case can be established, summary judgment remains appropriate because defendant's speech was privileged due to its subject matter and due to plaintiff's status as a public figure or limited public figure.

### A. No Harm to Plaintiff's Reputation

In Kansas, "damage to one's reputation is the essence and gravamen of an action for defamation." Gobin v. Globe Publishing Co., 232 Kan. 1, 6, 649 P.2d 1239 (1982). "Unless injury to reputation is shown, plaintiff has not established a valid claim for defamation, by either libel or slander, under [Kansas] law. It is reputation which is defamed, reputation which is injured, reputation which is protected by the laws of libel and slander." Id. In this case, although plaintiff has alleged that his reputation was harmed by defendant's documentary, he has failed to provide the court with any evidence supporting such an allegation. Pursuant to Fed.R.Civ.P. 56(c), the court grants summary judgment in favor of defendant on plaintiff's defamation claim. See Anderson, 477 U.S. at 256, 106 S.Ct. 2505.

### B. Defendant's Communication was Qualifiedly Privileged

Even if plaintiff had established a prima facie case for defamation, summary judgment would remain appropriate. During any defamation proceeding, the defendant

may argue a number of affirmative defenses. The defense relevant to this case is privilege. Whether a communication is privileged is a question of law to be determined by the court. *See Turner v. Halliburton Co.*, 240 Kan. 1, 7, 722 P.2d 1106 (1986).

 Defendant argues that its communication was privileged because it involved matters of public concern and because plaintiff is public figure. Because the court concludes that the communication was privileged due to its subject matter, it need not reach the public figure argument. In Kansas, communications involving matters of public concern are qualifiedly privileged. *See* PIK 3d § 127.53 (1998); *see also Knudsen v. Kansas Gas & Elec. Co.*, 248 Kan. 469, 479, 807 P.2d 71 (1991); *Stice v. Beacon Newspaper Corp.*, 185 Kan. 61, 65, 340 P.2d 396 (1959). When a communication is qualifiedly privileged, a plaintiff may only recover upon a showing of actual malice on the part of defendant. *Knudsen*, 248 Kan. at 479, 807 P.2d 71 (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)); PIK 3d § 127.53.

In this case, defendant broadcast footage from an anti-drug protest designed to combat the selling of illegal drugs in Kansas City, Kansas. The question for the court is whether the broadcast involved a matter of public concern. In answering this question, the court must consider the alleged defamatory communication's content, form, and context as revealed by the whole record. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985); *Turner*, 240 Kan. at 7, 722 P.2d 1106.

 After reviewing the record before it, the court concludes that defendant's broadcast of a community drug protest in front of plaintiff's store involved a matter of public concern. The protestors featured in the documentary were essentially picketing a local business because of its alleged involvement in illegal drug trade. Such an event is a matter of public concern. Al-

though plaintiff contends that he had never sold drugs and that the protestor's statements were false, whether drugs were actually being sold from plaintiff's business is not relevant at this stage of the court's inquiry. The protest itself was the newsworthy event. Because the communications in this case involved a matter of public concern, the court must next determine whether defendant acted with actual malice in broadcasting the allegedly false statements contained in the communication. *See Turner*, 240 Kan. at 8, 722 P.2d 1106.

 To prove actual malice in Kansas, a plaintiff must prove by clear and convincing evidence that the publication was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false and that the publication was made with actual evil-mindedness or specific intent to injure. PIK 3d § 127.53; *see also Turner*, 240 Kan. at 8–10, 722 P.2d 1106; *Schulze v. Coykendall*, 218 Kan. 653, 661, 545 P.2d 392 (1976), *overruled in part on other grounds by Schulze v. Board of Educ.*, 221 Kan. 351, 559 P.2d 367 (1977); *Munsell v. Ideal Food Stores*, 208 Kan. 909, 920–21, 494 P.2d 1063 (1972). From the record before it, the court concludes that no reasonable jury could find that defendant acted with actual malice in broadcasting footage of the August 14, 1996 protest.

 In his affidavit, Simon testified to the following: (1) he was told by numerous anti-drug protestors—including the Washingtons and Beatrice Lee—that drugs were being sold from the store at 10th and Walker; (2) police records he saw indicated that criminal activity was often reported on or near the 10th and Walker intersection; (3) he was aware that approximately 500 citizens had signed a petition urging the city council to close down plaintiff's business; and (4) he was personally convinced that drugs were being sold from the plaintiff's store at 10th and Walker. Plaintiff fails to properly controvert or refute Simon's sworn testimony. Moreover, plaintiff fails to provide

clear and convincing evidence that defendant acted with actual malice in broadcasting the footage of the protest. The record contains no evidence that defendant knew that the documentary contained false statements or that defendant acted with reckless disregard as to the truth of its broadcast.[3] The record likewise contains no evidence that defendant's decision to broadcast its documentary was made with evil-mindedness or with a specific intent to injure. Accordingly, summary judgment in favor of defendant is appropriate.

IT IS, THEREFORE, BY THE COURT ORDERED that defendant Home Box Office Inc.'s motion for summary judgment (Doc. 29) is granted.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**

---

**3.** Plaintiff argues that, because he notified defendant by letter that he did not sell drugs, defendant knew or should have known that the statements contained in the documentary were false. The court concludes that plaintiff's denials do not cut off defendant's First Amendment protections or take away its privilege. *See Edwards v. National Audubon Soc., Inc.*, 556 F.2d 113, 121 (2d Cir.1977) ("Surely liability under the 'clear and convincing proof' standard of *New York Times v. Sullivan* cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.").